1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| CRAIG FARLEY,<br><br>                              Petitioner,<br><br>v.<br><br>SCOTT KERNAN,<br><br>                              Respondent. | Case No.:  16CV188 LAB (BGS)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE TO DENY PETITION FOR WRIT OF HABEAS CORPUS** |

16

Petitioner Craig Farley ("Petitioner" or "Farley") has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted of first degree murder, robbery, and burglary.[1]  (Lodgment 3, Part 1 at 85, 92, 96.)  The jury additionally found Petitioner committed the murder while engaged in a robbery and burglary, that Petitioner committed all three crimes for the benefit of a criminal street gang, and that while acting as a principal another principal used and personally discharged a firearm proximately causing great bodily injury or death.  (*Id.* at 88-91.)  The jury also found Petitioner committed the burglary and robbery in an inhabited dwelling.  (*Id.* at 92, 96.)

---

[1] Case No. SCD 229026 in the Superior Court of San Diego County

Petitioner was sentenced to life without the possibility of parole plus an additional consecutive sentence of 25 years to life.  (Lodgment 1, Part 14 at 3088.)

The Court addresses nine claims[2] for habeas relief: (1) ineffective assistance of trial counsel for failing to introduce evidence of witnesses' failure to identify him in a live police line-up; (2) ineffective assistance of trial counsel for failing to present evidence of innocent explanations for Petitioner's behavior following the murder; (3) ineffective assistance of trial and appellate counsel for failing to raise insufficiency of the evidence for first degree murder; (4) ineffective assistance of trial and appellate counsel for failing to raise a *Batson/Wheeler* challenge; (5) ineffective assistance of trial counsel for failing to raise third-party culpability as to Leroy Thomas; (6) admission of inadmissible gang expert opinion; (7) juror misconduct; (8) admission of evidence of Petitioner's tattoos; and (9) exclusion of evidence of third-party culpability as to David Foster.  (Pet. [ECF No. 1][3].)  Respondent filed an Answer and Petitioner filed a Traverse. [ECF Nos. 18, 26.]

The Court submits this Report and Recommendation to United States District Judge Larry A. Burns pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.  After consideration of the Petition, Respondent's Answer, Petitioner's Traverse, as well as lodgments and exhibits submitted by the parties, the Court recommends the Petition be **DENIED**.

---

[2] In an effort to address all the issues potentially raised by Petitioner, the Court has organized the issues raised in the Petition into nine claims.  In analyzing each, the Court notes where each was identified in the Petition and, if applicable, any corresponding ground identified in the Petition.  As the Court explains in more detail below, three of the claims the Court addresses were not identified as "grounds" for relief in the Petition, but rather, were listed as claims that were raised on collateral review before the state courts.
[3] All citations to the Petition are to the ECF chronological page numbers for ease of reference.

# I.   BACKGROUND

## A.   Factual Background

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  Accordingly, the following facts are taken from the California Court of Appeal's November 14, 2014 opinion:

A. The murder

Victim Jonathan Pleasant sold marijuana from his apartment. He often possessed considerable amounts of marijuana, which he kept in a backpack, as well as large amounts of cash. Pleasant kept a gun by his bed, and sometimes carried the gun on his person.

Pleasant spent the evening of June 28, 2010 at home with his girlfriend, Esther Magnus. During the evening, Pleasant left the apartment with about $2,000 in cash. He returned with several bags of marijuana. At about 10:30 p.m. that evening, Farley came to Pleasant's apartment. While at the apartment, the two men smoked marijuana and discussed a marijuana purchase. Farley said that he did not have money, but that he would return. Ten minutes later, Farley returned and told Pleasant that he would come back the following morning to buy the marijuana. Farley departed the apartment.

The next morning, Pleasant and Magnus discussed their plan to go out together that day. At approximately 11:15 a.m., Magnus left Pleasant's apartment. The two planned for Pleasant to meet Magnus at her residence just after noon. Magnus testified that before she left, Pleasant told her that he was waiting for Farley to come to the apartment. Pleasant also told Magnus that his friend, Corey Wishom, was planning to stop by the apartment, as well.

As Magnus was leaving, Pleasant's neighbor, Mark Dobie, came to the apartment and smoked marijuana with Pleasant. While the two

visited, Pleasant received a phone call. Dobie heard Pleasant tell the caller to "hurry up and come" because Pleasant had to leave soon.

Soon thereafter, Wishom arrived at Pleasant's apartment. Dobie met Wishom and then went back to his own apartment. Pleasant showed his marijuana to Wishom, who purchased some. Following a short visit, Wishom said goodbye to Pleasant and began to leave the apartment.

As Wishom was leaving, two men arrived at Pleasant's door. Pleasant said to one of the men, "Oh, I've been waiting for you." One of the men stepped into the living room and said, "This is my brother and he's cool." Wishom testified that both men were African–American. The man who said, "[t]his is my brother and he's cool" was wearing black Nike shoes, black basketball shorts, white socks pulled up to his knees, a black hoodie, and a backpack strapped to his chest. The man had short clipped hair and a tattoo on the top of one of his arms. Apart from his race, Wishom was unable to provide any further description of the second man. After this short encounter, which occurred at approximately 11:30 a.m., Wishom left the apartment.

Pleasant's neighbor, Lynshel Reid–Jones, testified that at about this time, she heard a melee and a loud "boom" come from Pleasant's apartment. Reid–Jones then heard Pleasant crying for help. Reid–Jones looked outside and saw two young African–American males sprinting from Pleasant's apartment with a backpack that she believed belonged to Pleasant.

At 11:44 a.m., Dobie received a phone call from his sister, Breanna Sandle, saying that she had just seen two men running from the apartment complex and that it appeared that someone had been robbed. Sandle testified that she saw two African–American males, who appeared to be in their 20s, running from the apartment complex. One of the men was wearing a backpack. When shown a photographic lineup by police, Sandle focused on two of the photographs, one of which depicted Farley, before telling the officer that she could not be sure whether he was one of the men she had seen fleeing the apartment complex.

Immediately after the shooting, several neighbors attempted to help Pleasant, who was bleeding profusely. Pleasant cried, " 'They shot

me. They shot me. Oh, God, they shot me.' " Emergency personnel responded to the apartment and pronounced Pleasant dead at the scene.

## B. The crime scene

Investigators determined that Pleasant sustained a large gunshot wound to his right buttock. The nature of the wound suggested that Pleasant had been shot from a range of approximately one to three feet away. Pleasant also suffered blunt force trauma to his head, consistent with his having been struck by a gun.

Pleasant's apartment was in disarray, consistent with a struggle or fight having occurred. Police found a slide from a firearm, handcuffs, and a handcuff key in a hallway. Police also found an open, empty safe on the floor of a bedroom and a bag of marijuana on the living room floor. In addition, police found a black Pittsburgh Pirates baseball cap in the living room and a roll of duct tape in the bathroom.

## C. DNA and fingerprint evidence

Investigators determined that Farley's DNA was on the duct tape. Police found DNA from a person named Pierre Terry on the baseball cap. Terry's DNA was also found on the gun slide, on blood samples collected from the apartment, and in fingernail scrapings taken from Pleasant. Terry's fingerprints were also found on artwork in the living room.

## D. Cell phone records

On the morning of the murder, several short calls were made between Farley's and Pleasant's cell phones, between 10:37 a.m. and 10:39 a.m. At 11:30 on the morning of the murder, the signal from an outgoing phone call made on Farley's phone that lasted 59 seconds terminated at a cell phone tower located on Pleasant's apartment building. A text message was sent from Terry's phone to Farley's phone at 11:33 a.m. From 11:31 a.m. until 11:48 a.m. there was no activity on Farley's cell phone. Beginning at 11:50 a.m., Farley and Terry exchanged numerous text messages. Less than two hours later, a request was made to Farley's cell phone provider for a new phone number. The request was granted. Cell phone records for Farley's new

cell phone number showed him leaving California the following morning and traveling across the United States to Louisiana.

E. Farley's arrest, escape and rearrest

Approximately a month and a half after the murder, authorities in Baton Rouge, Louisiana arrested Farley and took him to a police station. Farley escaped from the station and ran down a nearby street. With the assistance of a police dog, police found Farley hiding in a garbage can.

While being transported back to San Diego, Farley asked one of the officers if he could be charged with a gang crime because the other defendant was a gang member. While the officer had made some statements about the case to Farley, he had not said anything to Farley about the other defendant in the case being a gang member.

Police found several items in a Baton Rouge hotel room where Farley had been staying, including a laptop computer. It was later determined that searches had been performed on the computer related to the murder and the ensuing investigation.

F. Gang Evidence

Detective Joseph Castillo of the San Diego Police Department testified as a gang expert. Detective Castillo stated that the Skyline "Piru" gang is the largest African–American gang in San Diego. Gang members wear the color red and sometimes wear Pittsburgh Pirates baseball caps. Detective Castillo stated that the primary activities of the Skyline Piru gang include murder and robbery.

Castillo testified that Pierre Terry is a documented Skyline gang member and that Farley also appeared to be a Skyline Piru gang member, although he had not previously been documented. In addition, . . . Castillo offered his opinion that a hypothetical crime based on the evidence in this case would benefit, promote, assist and further the criminal conduct of the Skyline Piru gang.

(Lodgment 6. at 3-8.)

6

Petitioner was found guilty of first degree murder (Cal. Penal Code § 187(a)); robbery (Cal. Penal Code § 211); and burglary (Cal. Penal Code § 459). (Lodgment 3, Part 1 at 85, 92, 96.) The jury additionally found Petitioner committed the murder while engaged in a robbery and burglary, (Cal. Penal Code § 190.2(a)(17)), that Petitioner committed all three crimes for the benefit of a criminal street gang, (Cal. Penal Code § 186.22(b)(1)), and that while acting as a principal another principal used and personally discharged a firearm proximately causing great bodily injury or death, (Cal. Penal Code § 122022.53(b)-(d), (e)(1). (Lodgment 3; Part 1 at 88-91.) The jury also found Petitioner committed the burglary and robbery in an inhabited dwelling, (Cal. Penal Code § 212.5(a)). (Lodgment 3, Part 1 at 92, 96.)

### B.   Procedural Background

Following multiple days of testimony before the trial court on Petitioner's motion for a new trial approximately a year after Petitioner was convicted, including testimony from his trial counsel, Petitioner's parents, and Petitioner, the trial court found Petitioner was not entitled to a new trial. Petitioner filed an appeal to the Fourth District Court of Appeal in which he argued he received ineffective assistance of counsel based on trial counsel's failure to present evidence he was not identified by two witnesses in live police line-ups and innocent explanations for his departure to Louisiana immediately after the murder, his internet search history, and the changing of his phone number the day of the murder. (Lodgment 4 at 9-21.) He additionally argued the trial court erred in admitting gang expert testimony, failing to question a juror regarding potential misconduct, admitting evidence of Petitioner's tattoos, and failing to allow evidence of third-party culpability as to David Foster, the victim's brother. (*Id.* at 21-43.)

The Court of Appeal found no ineffective assistance of counsel and no error by the trial court.[4] (Lodgment 6.) Petitioner filed a Petition for Review with the California

---

[4] The Court of Appeal did strike a parole revocation fine because Petitioner was sentenced to life without the possibility of parole.

1   Supreme Court raising the same claims.  (Lodgment 7.)  It was summarily denied.

2   (Lodgment 8.)

3           Petitioner then filed a writ of habeas corpus in San Diego Superior Court.[5]

4   Petitioner raised claims that his trial and appellate counsel were ineffective for failing to

5   raise: (1) third-party culpability as to Leroy Thomas; (2) insufficiency of the evidence for

6   First Degree Murder; and (3) a *Batson/Wheeler* challenge.  (Lodgment 9.)  The superior

7   court denied the petition, finding as to each claim that Petitioner had failed to set forth an

8   adequate record to allow the court to conduct a rational review.  (Lodgment 10.)

9   Petitioner then filed a petition with the Fourth District Court of Appeal raising the same

10  claims  (Lodgment 11.)  The Court of Appeal denied his petition, finding he failed to

11  provide any record to support his claims. (Lodgment 12.)  Petitioner then filed a Petition

12  for Review with the California Supreme Court raising the same claims.  (Lodgment 13.)

13  The California Supreme Court summarily denied his Petition for Review.  (Lodgment

14  14.)

15  **II.    STANDARD OF REVIEW**

16          Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

17  applicable to this Petition, a habeas petition will not be granted unless that adjudication:

18  (1) resulted in a decision that was contrary to, or involved an unreasonable application of

19  clearly established federal law; or (2) resulted in a decision that was based on an

20  unreasonable determination of the facts in light of the evidence presented at the state

21  court proceeding.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  "This is a

22  'difficult to meet' and 'highly deferential standard for evaluating state-court rulings,

23  which demands that state-court decisions be given the benefit of the doubt.'"  *Cullen v.*

24  *Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102

25  (2011); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

26

27  ───────────────

28  [5] Case No. HC22111.

"The 'contrary to' and 'unreasonable application of' clauses in § 2254(d)(1) are distinct and have separate meanings." *Moses v. Payne*, 555 F.3d 742, 751 (9th Cir. 2008) (citing *Lockyer v. Andrade*, 538 U.S. 63, 73-75 (2003)). "Under the 'contrary to' clause of § 2254(d)(1), a federal court may grant relief only when 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Loher v. Thomas*, 825 F.3d 1103, 1111 (9th Cir. 2016) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).

"Under the 'unreasonable application' clause of § 2254(d)(1), 'a state-court decision involves an unreasonable application of the Supreme Court's precedent if the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoners case.'" *Id.* (quoting *White v. Woodall*, 134 S. Ct. 1697, 1705 (2014). Unreasonable application is "not merely wrong" or "even clear error." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). It must be "objectively unreasonable." *Id.* "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* at 1377 (quoting *Harrington*, 562 U.S. at 103). "[R]elief is available under § 2254(d)(1)'s unreasonable application clause if, and only if, it is obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *Woodall*, 134 S. Ct. at 1706-07 (citing *Harrington*, 562 U.S. at 103); *see also Williams*, 529 U.S. at 411 ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

Under § 2254(d)(2) "a petitioner may challenge the substance of the state court's finding and attempt to show that those findings were not supported by substantial

evidence" or "challenge the fact-finding process itself on the ground that it was deficient in some material way." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). "Regardless of the type of challenge, 'the question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold." *Id.* "[W]hen the challenge is to the state courts procedure, . . . [the court] must be satisfied that *any* appellate court to whom the defect in the state court's fact-finding process is pointed out would be unreasonable in holding that the state courts fact-finding process was adequate." *Id.* at 1146-47; *see also Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004). (the federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.").

Section 2254(e) (1) provides: "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1).  The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*

Where, as here, there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned decision and presumes it provides the basis for the higher court's denial of a claim or claims.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991);[6] *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 n.1 (2013).  Here, the California Court of Appeal's November 14, 2014 decision is the last reasoned decision on most of Petitioner's claims.[7]

---

[6] The Court notes that the United States Supreme Court granted certiorari in *Wilson v. Sellers*, 2017 WL 737820, on February 27, 2017 to address whether the Supreme Court's decision in *Harrington*, 562 U.S. 86 silently abrogated *Ylst*'s direction to look through a summary ruling to the last reasoned decision.

[7] The Court of Appeal's October 14, 2015 decision, that takes notice of the November 14, 2015 decision on direct appeal, is the last reasoned decision on the three claims raised only on collateral review: (1) ineffective assistance of counsel for failing to raise third-party culpability as to Leroy Thomas; (2) ineffective assistance of counsel for failing to

## III.   DISCUSSION

### A.   Ineffective Assistance of Counsel Claims

Petitioner raises numerous claims regarding ineffective assistance of counsel.  He argues his trial counsel should have presented evidence that Breanna Sandle and Corey Wishom failed to identify Petitioner in live police line-ups.  (Pet. at 2, 5; Lodgment 7 at 5-9.[8])  Petitioner argues his trial counsel should have presented evidence of innocent explanations for his trip to Louisiana, his internet search history while there, and his change in phone number following the murder.  (Pet. at 4; Lodgment 7 at 9-14.)  Finally, Petitioner argues his trial and appellate counsel were ineffective for failing to raise sufficiency of the evidence for first degree murder, third-party culpability as to Leroy Thomas, and a *Batson/Wheeler* challenge.  (Pet. at 12; Lodgment 13 at 8-25.)  Each claim is addressed below.

When evaluating claims for ineffective assistance of counsel under ADEPA, the Court's review is "'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'"  *Woods*, 135 S. Ct. at 1376 (quoting *Burt v Titlow*, 134 S. Ct. 10, 13 (2013)).  As explained more fully below, review under *Strickland*, the standard for evaluating an ineffective assistance of counsel claim, is deferential to counsel's decisions, and review under AEDPA is deferential to the state court's decision finding no violation of *Strickland*.  *See Harrington*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so.")

---

raise insufficiency of the evidence; and (3) ineffective assistance of counsel for failing to raise a *Batson/Wheeler* challenge. (Lodgment No. 12.)

[8] In addition to the arguments Petitioner makes in the Petition itself, he refers to Exhibit A attached to his Petition, his December 23, 2014 Petition on direct appeal to the California Supreme Court, for more elaboration on numerous claims.  The Court's analysis takes into consideration the arguments advanced in that filing, including the final page, not included as part of Exhibit A, but provided by Respondent in Lodgment 7.  All further references are to Lodgment 7.

16CV188 LAB (BGS)

Under *Strickland*, a defendant must "show that counsel's performance was deficient." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This "first prong sets a high bar." *Buck v. Davis*, 2017 WL 685534, at *13 (2017). "A defense lawyer navigating a criminal proceeding faces any number of choices about how best to make a client's case." *Id.* Counsel's constitutional obligation under *Strickland* is satisfied "so long as his decisions fall within the 'wide range' of professionally competent assistance." *Id.* (quoting *Strickland*, 466 U.S. at 690); *see also Harrington*, 562 U.S. at 104 (A reviewing court must indulge "a strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance."). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690.) "It is only when the lawyer's errors were 'so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment' that *Strickland*'s first prong is satisfied." *Buck*, 2017 WL 685534, at *13 (quoting *Strickland*, 466 U.S. at 687).

The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Strickland*, 466 U.S. at 697. However, assuming a defendant can establish deficient performance under this highly deferential standard, prejudice must also be shown. *Harrington*, 562 U.S. at 104. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting *Strickland*, 466 U.S. at 693). A defendant "must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694); *see also Buck*, 2017 WL 685534, at *14. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

When evaluating claims of ineffective assistance of counsel under § 2254(d), as the Court is here, the court is not considering "whether defense counsel's performance fell below *Strickland*'s standard." *Harrington*, 562 U.S. at 101. "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id.* "A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105.

### 1.    Failing to Introduce Evidence of Live Police Line-Ups[9]

Trial counsel did not introduce evidence that Sandle and Wishom failed to identify Petitioner in live line-ups. Petitioner argues this would have provided further evidence that he was not one of the individuals observed at Pleasant's apartment before the murder or fleeing the apartment following the murder. (Pet. at 5; Lodgment 7 at 5-9) Petitioner argues this evidence was significant because the live line-ups occurred on September 17, 2010 in closer proximity to the murder and when the prosecutor had obtained a "no haircut" order to allow witnesses to see him with a hairstyle similar to that he would have had at the time of the murder. (Lodgment 7 at 5.) The witnesses in-court non-identification of Petitioner did not occur until his trial in October 2011. Petitioner additionally argues this testimony was significant because both Sandle and Wishom testified they tentatively selected Petitioner in photographic line-ups before indicating they did not know if he was one of the individuals they saw. (*Id.* at 7.) Petitioner also argues that this evidence could have been presented through the officer that conducted

---

[9] Petitioner raises this issue in Ground One of his Petition with a reference to his December 23, 2014 Petition on direct appeal to the California Supreme Court, for more elaboration. As noted above, the Court has considered these arguments and all references are to Lodgment No. 7.

the live line-up to avoid having Sandle or Wishom change their mind and identify Petitioner.  (*Id.* at 8.)  Petitioner also argues trial counsel's concern that the live line-up evidence would emphasize police suspicion was unreasonable because police suspicion would be obvious from Petitioner being charged with murder.  (*Id.* at 8.)

Respondent argues that, given neither witness had identified Petitioner at trial and both confirmed on cross examination that they did not identify Petitioner in six-pack photographic line-ups conducted shortly after the murder, his trial counsel made a reasonable tactical decision not to introduce additional evidence of non-identification in the live police line-ups.  Respondent emphasizes trial counsel's testimony during the hearing on Petitioner's motion for a new trial that he did not want to give the witnesses a chance to change their testimony by raising the live police line-ups or emphasize the police interest in Petitioner.

The Court of Appeal concluded that counsel's decision did not fall below "prevailing professional norms."  (Lodgment 6 at 13.)  The Court considered Petitioner's argument that the live line-up evidence could have been presented through the testimony of the officers conducting it, avoiding the risk that the witnesses would reconsider their non-identification of Petitioner on cross examination and identify him.  (*Id.* at 12.)  The court also considered defense counsel's testimony that he decided not to offer the live line-up evidence because neither witness had identified Petitioner at trial and he wanted to avoid emphasizing to the jury that Petitioner was a suspect immediately after the murder.  (*Id.* at 12.)  The Court of Appeal found trial counsel could reasonably have determined that additional evidence of a non-identification was of "marginal benefit." (*Id.* at 13.)

The Court of Appeal's decision was not unreasonable.  At the hearing on Petitioner's motion for a new trial, Petitioner's trial counsel testified that he decided not to introduce evidence that Wishom and Sandle had not identified Petitioner at live line-ups because neither had identified Petitioner at trial.  (Lodgment 1, Part 11 at 2567-68.) He explained that "nobody in the courtroom was pointing the finger at him as an offender

14

in the case, I didn't want to go back and rehash the police's suspicion that he'd been one of the offenders and had been in a line-up.  I made a conscious decision not to present that evidence."  (*Id.* at 2568.)  He indicated he had a lack of in-court identification in front of the jury and he did not want to risk giving them an opportunity on cross examination to say something different.  (*Id.* at 2604-05.)  And, he stated more generally, "it is my view that when – when there is a lack of an in-court identification of the defendant, of my client, as an offender, that I don't want to go back and give them another chance to make their statement of identification better."  (*Id.* at 2603.)

There is certainly at least a reasonable argument that counsel satisfied *Strickland*'s deferential standard.  *Harrington*, 562 U.S. at 105 ("the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.")  No witness had identified Petitioner at the location of the murder at the time of the murder and the two witnesses that did see the individuals believe to be responsible for the murder coming and going from the apartment did not identify Petitioner in court.  There may have been some benefit in emphasizing that Petitioner was also not identified at the live line-ups, closer to the time to when the witnesses would have seen him.  But, when weighed against trial counsel's concerns about the witnesses reconsidering their testimony or emphasizing further that Petitioner was a suspect shortly after the murder, there is at least a reasonable argument that counsel's decision fell "within the 'wide range' of reasonable professional assistance."  *Id.* at 104.  The Court recommends Petitioner's claim for ineffective assistance of counsel for failing to introduce evidence of the live police line-ups be **DENIED**.

### 2.    Failing to Introduce Evidence of Innocent Explanations[10]

At trial, the prosecutor argued Petitioner's flight from San Diego to Louisiana, his searching for information on who was in jail and for warrants issued for himself and others, and his phone number change right after the murder reflected consciousness of guilt.  Petitioner argues his trial counsel should have presented evidence of innocent explanations for his trip to Louisiana, his internet search history, and his change in phone number the day of murder.  (Pet. at 4; Lodgment 7 at 9-14.)  The Court considers each.

#### a)    Trip to Louisiana

Petitioner asserts trial counsel was ineffective in failing to introduce evidence of Petitioner's calls to and from his wife in Louisiana in the months preceding the murder to provide an innocent explanation why Petitioner went to Louisiana — it was a preplanned trip to visit his wife rather than flight following a murder.  (Pet. at 5; Lodgment 7 at 9-10.)  Respondent argues the innocent explanation for the trip to Louisiana that Petitioner wanted his trial counsel to put before the jury was extremely problematic and declining to do it was a tactical decision.

The Court of Appeal found trial counsel's decision not to present evidence of Petitioner's communications with his wife in the months leading up to the murder was a reasonable tactical decision.  (Lodgment 6 at 16.)  The court noted trial counsel had explained he found Petitioner's story regarding the trip preposterous and did not think it would be well received by the jury.  (*Id.*)  Petitioner claimed that he preplanned the trip to visit his wife, from whom he was separated, for his wedding anniversary, and brought his girlfriend, a prostitute, on the trip for "female companionship."  (*Id.* at 14.)  The court also explained that trial counsel thought Petitioner's wife and girlfriend, each of which might have had to testify to the trip, particularly given Petitioner elected not to testify a

---

[10] As with the prior claim, Petitioner raises this claim in Ground One of his Petition and refers to his Petition to the California Supreme Court on direct appeal for more elaboration.

week before trial, would not have been seen as credible. (*Id.* at 15.) The court also found that while evidence of Petitioner's communications with his wife in Louisiana might have explained his going to that location, as opposed to another, it did not explain the timing of the trip, the day after the murder. (*Id.* at 15-16.)

As to Petitioner's wife, trial counsel testified that she "presented big problems, potential problems . . . . She'd been interviewed by the police in the case, she was made aware that Mr. Farley had come together with his other girlfriend, who was a prostitute, and she was decidedly unhappy about that." (*Id.* at 2631.) Trial counsel also explained that Petitioner's girlfriend would not have been a good witness. (*Id.* at 2594.) He indicated he could not determine whether she was lying when they spoke and that because she was a prostitute, she brought with her significant baggage, including that the jury might think that Petitioner was her pimp, particularly given that she had apparently prostituted herself on their trip. (*Id.* at 2566, 2590, 2594.) He acknowledges that having an innocent explanation for the trip would have been helpful, but the options to present it once Petitioner decided not to testify were not good. (*Id.* at 2594.) Although the Court of Appeal did not specifically rely on it, trial counsel also explained that he relied on Petitioner's cell phone records, admitted by the prosecutor, showing calls between Petitioner and a phone number with a Louisiana area code prior to the murder and argued that this connection to someone in Louisiana prior to the murder showed an alternate reason for his trip to Louisiana other than fleeing. (*Id.* at 2607-08, 2630-31.)

Trial counsel chose to avoid an undesirable and potentially unbelievable explanation for the trip and having that less-than-appealing story presented by bad witnesses to a jury. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. But, the reviewing court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Counsel identified significant problems with Petitioner's explanation for

the trip in both the trip itself and the witnesses that would have to testify to it.  He decided not to attempt to get that explanation in front of the jury, and instead emphasized evidence that Petitioner knew someone in Louisiana that he was communicating with prior to the murder to suggest he was not fleeing.  If trial counsel had sought to admit evidence of Petitioner's calls to his wife in advance of the murder to show the trip was preplanned, the trip itself, with all its baggage, might have been presented to the jury.  If that had happened, Petitioner would surely be arguing now that counsel was ineffective for putting that unfavorable and less-than-credible story in front of the jury instead of just relying on phone records showing his calls to a Louisiana number prior to the murder for an innocent explanation.  It is exactly the type of decision that should not be second-guessed, particularly under AEDPA's doubly deferential review.  *See Woods*, 135 S. Ct. at 1376 (explaining doubly deferential review based on deference to both the state court and the defense attorney's decisions).  The Court of Appeal's conclusion that counsel did not provide ineffective assistance in failing to present evidence of Petitioner's calls to his wife prior to the murder was not unreasonable.  The Court recommends Petitioner's claim for ineffective assistance of counsel for failing to introduce evidence of Petitioner's communications with his wife prior to the murder be **DENIED**.

### b)      Evidence of Petitioner's Communications with His Parents

Petitioner asserts trial counsel failed to introduce evidence Petitioner's parents told him about the murder and the execution of a search warrant at their home related to the murder while he was in Louisiana and evidence his mother changed his phone number.[11]

---

[11] As to the issue of counsel failing to present testimony from Petitioner's mother that she changed his phone number, the claim is not clearly raised.  The only reference in the Petition or Traverse to it is under a section where he lists the claims he raised on direct appellate review.  (Pet. at 4.)  In listing the claim raised on direct appeal for ineffective assistance of counsel for failing to provide innocent explanations for the trip to Louisiana and his internet searches, he also includes "the change in phone number."  (*Id.*).  Unlike the remainder of that claim, that he raises in Ground One in his Petition, he does not otherwise raise this issue in his Petition or Traverse.  Additionally, there is nothing else in

(Pet. at 5; Lodgment 7 at 11-14.)  He asserts that this information would have provided an innocent explanation for his internet searches for warrants and on the "Who's in Jail" website for himself and his co-defendant Terry as well as his question to a police officer that escorted him from Louisiana to San Diego concerning whether he could be charged with a gang crime because the other defendant was a gang member.  (Pet. at 5; Lodgment 7 at 11-12.)

Respondent argues trial counsel's decision not to introduce evidence Petitioner's mother told him about Pleasant's killing and that Petitioner was a suspect was a tactical decision.  Specifically, Respondent argues that trial counsel assessed she would have been a horrible witness because of her hostile and uncooperative demeanor. Additionally, Respondent argues that this story was inconsistent with the story Petitioner told counsel a week before trial — that he arranged for others to rob Pleasant.

The Court of Appeal found that trial counsel's decision not to introduce evidence that Petitioner's mother had informed him that the police were investigating him was a reasonable tactical choice.  (Lodgment 6 at 19.)  In summarizing trial counsel's testimony, the Court of Appeal explained that he had spoken with Petitioner's parents numerous times and found Petitioner's mother to be hostile and assessed her as "likely to be a 'terrible witness.'"  (*Id.* at 18.)  The court also noted that evidence his mother informed him about the police investigation was not necessarily inconsistent with his guilt.  (*Id.* at 19)  As to Petitioner's father, the Court of Appeal found Petitioner had not claimed that trial counsel could have presented an explanation for the computer searches

---

the exhibits attached to his Petition, exhibits referenced in the Petition, or subsequent filings with the Court suggesting he is raising a claim on this basis in his Petition. Although Respondent does not address it and the Court could find it was not raised, the Court gives the Petition the benefit of a very liberal construction and addresses the issue. *Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) and finding "[p]risoner pro se pleadings are given the benefit of liberal construction.").

solely through Petitioner's father, rather it was his mother's testimony that was important. (*Id.* at 18.)  The court does, however, note that trial counsel indicated that Petitioner's father had little to say and he did not recall having any discussions with him about communications with Petitioner while Petitioner was in Louisiana.  (*Id.* at 18.)  Finally, the Court of Appeal notes that Petitioner did not argue on appeal that trial counsel failed to properly investigate his parents as potential witnesses.  (*Id.* at 19 n.6.)

The Court of Appeal did not specifically address the potential testimony from Petitioner's mother that she had Petitioner's phone number changed.  Nor does Respondent specifically address this argument.  This is likely because the issue was noted only in a single paragraph amidst Petitioner's briefing to the Court of Appeal on trial counsel's decision not to present the testimony about Petitioner's parents' communications with him.  (Lodgment 4 at 15-16.)  The Court of Appeal's conclusion that trial counsel did not err in not having Petitioner's mother testify because she would be a bad witness would similarly apply to her testifying as to the phone number change. Additionally, Petitioner has not shown that his counsel's failure to present this evidence "fell below an objective standard of reasonableness."  *Harrington*, 562 U.S at 104.  This Court notes that the record also reflects that had this testimony been presented, it might have been harmful.  Petitioner's mother testified during the hearing on his motion for a new trial that she was frustrated in speaking with Petitioner on the day of the murder because he was getting so many calls.  (Lodgment 1, Part 11 at 2451-52.)  The many calls were causing the phone to keep cutting off what Petitioner was saying, what she described as the interference from the continual beeping as calls kept coming in.  (*Id.*) And when she asked him if he was going to answer the calls, he replied "No.  I'm not trying to hear crazy stuff."  (*Id.* at 2452.)  Even if Petitioner's statements to his mother were not admitted, that he was receiving such an unusually high volume of calls that day that his mother changed his phone number to stop it, could suggest he was receiving calls related to the murder.  A jury might have also thought she was just a mother making up a story to protect her son.  If the explanation — changing a phone number because of call

volume in one conversation — seemed odd, the jury might have even found it suggested she was covering up something for him.  Although it might have been helpful to have an explanation for Petitioner's phone number changing the day of the murder, the explanation itself from his mother might have been more harmful to Petitioner's case, particularly given counsel's assessment of her as a witness.  Under these circumstances, trial counsel's representation did not "amount[] to incompetence under 'prevailing professional norms.'"  *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 688.)

The Court of Appeal's conclusion that trial counsel was not ineffective for failing to introduce testimony from Petitioner's parents that they informed him about the murder was not unreasonable. *Id.* at 105 ("the question is not whether counsel's action were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.").  Given trial counsel's assessment of Petitioner's parents, electing not to have them testify, assuming it was error at all, was not the type of "error[] so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  Trial counsel, having assessed Petitioner's mother on many occasions, considered her a terrible witness and it does not appear that he was aware Petitioner's father had communicated with Petitioner about the murder investigation while he was in Louisiana.  Although not specifically noted by the Court of Appeal, the proceedings on Petitioner's motion for a new trial also support counsel's assessment.  During questioning that does not appear to be going smoothly, the prosecutor requests Petitioner's mother be directed to answer his questions and notes "this goes back to the same dynamic we had for three and a half weeks in trial.  This witness sat in the back gallery, as well as in the hallway, frequently interrupted proceedings, even up to closing argument." (Lodgment 1, Part 11 at 2423.) The trial judge noted he had already made that direction, before giving it again.  (*Id.*) The Court recommends Petitioner's claim for ineffective assistance of counsel for failing to introduce evidence of innocent explanations for Petitioner's conduct be **DENIED**.

### 3.    Ineffective Assistance of Counsel Claims Raised on Collateral Review in State Court

#### a)    Whether These Claims Were Raised in the Federal Petition

Petitioner does not clearly assert these claims in his Petition.  The claims — ineffective assistance of trial and appellate counsel for failing to raise: sufficiency of the evidence for First Degree Murder; third-party culpability as to Leroy Thomas; and a *Batson/Wheeler* challenge — are referenced in his federal Petition in two places, but they are under listings for grounds raised on collateral review in state court.  (Pet. at 3, 12.)  He references Exhibit B to his Petition "for more established," but as with the listing above, it is under a heading for collateral review in state court.  (*Id.* at 12.)  Exhibit B is his habeas Petition to the California Supreme Court, which raise these claims.  (Lodgment 13.)  Another exhibit attached to his Petition, a request for stay and abeyance, suggests he is raising these claims in his federal Petition because he is seeking to exhaust these claims.  (ECF No. 1 at 15-19.)  Petitioner's filings after Respondent Answered also suggest he is raising these claims.  Petitioner references and seeks relief on the claims, including noting that Respondent failed to respond to them in his Answer.  (ECF Nos. 28, 38-39.)  Respondent's Answer indicates that he did not address these claims because Petitioner only raised them in the request for stay and abeyance attached as an exhibit to his Petition, rather than in his Petition.  (Answering Brief at 1, n.1 and 7 n. 5.)

Although the claims were arguably only identified in the actual Petition as part of the procedural history of the proceedings in state court, when viewed in the context of the exhibits attached to the Petition and Petitioner's later filings it appears he is likely attempting to raise these claims.  And, because "[p]risoner pro se pleadings are given the benefit of liberal construction" the Court addresses these claims.[12]  *Porter*, 620 F.3d at 958 (citing *Erickson*, 551 U.S. at 94).

---

[12] The Court does not address whether these claims are procedurally defaulted.  "Procedural default is an affirmative defense" that the state must generally assert. *Vang*

### b)   Failing to Raise Third-Party Culpability as to Leroy Thomas

Petitioner argues[13] that based on the evidence found in a search of Leroy Thomas' residence and the close relationship between Thomas and Terry, Petitioner's co-defendant, his trial counsel should have presented a third-party culpability defense as to Leroy Thomas and his appellate counsel should have raised his trial counsel's failure to do so on appeal.  (Lodgment 13, ECF No. 19-29 at 14.[14])

Petitioner explains that Thomas gave a statement to police indicating that Terry was with Petitioner the day of the murder, things went bad, and Petitioner fired a shot.  (*Id.* at 11.)  Petitioner points to testimony from Wishom indicating that one of the two men that came to Pleasant's apartment as Wishom was leaving just before the murder stated "This is my brother, he's cool."  (*Id.*)  Petitioner argues the brothers referenced in this statement were Terry and Thomas because Thomas indicated in a statement to police

_____

*v. Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003).  Respondent has not asserted it here. However, the Court does have the "discretion to consider the issue *sua sponte* if the circumstances warrant.  *Id.* (citing *Boyd v. Thompson*, 47 F.3d 1124, 1128 (9th Cir. 1998)).  In *Boyd*, the procedural default was obvious from the face of the petition and the state had not waived the defense because the court raised it before the state responded. *Id.* (citing *Boyd*, 147 F.3d at 1127-28).  And in *Vang*, the court reversed the district court for raising it *sua sponte* when the state did not raise the defense despite full briefing on the claims.  *Id.*  Here, procedural default as to these claims is not obvious from the Petition and the state has already responded to the Petition.  While the Court would not necessarily find the defense waived as in *Vang* — given how questionable it is Petitioner even properly raised these claims in his federal Petition — the state has fully briefed the Petition and did not assert the procedural default defense.  Additionally, even if it were proper to raise the defense *sua sponte*, courts may address the merits, as the Court does here, instead of a potential procedural bar.  *See Lambrix v. Singletary*, 520 U.S 518, 525 (1997).

[13] This argument is drawn from the filing attached as Exhibit B and referenced for support in the Petition, Petitioner's Petition for Review filed with the California Supreme Court. The same filing is before the Court as Lodgment 13.  Further references are to Lodgment 13.

[14] All references to Lodgment 13 are to the ECF page numbering.

1  that he spoke with Terry regularly and lived next door to him.  (*Id.*)  Petitioner

2  additionally argues that Terry utilized the assistance of another inmate, Miguel Gonzaba,

3  to get a letter out of the prison to have Thomas killed for snitching on Terry.  (*Id.* at 12-

4  14.)

5       The Court of Appeal's October 14, 2015 decision rejected Petitioner's claim of

6  ineffective assistance of counsel for failing to raise third-party culpability as to Leroy

7  Thomas because Petitioner failed to provide any records or documents to support the

8  claim.  (Lodgment 12 at 1-2.)  The Court notes that it appears the only document

9  submitted in support of the state petition was a picture of Leroy Thomas.  (Lodgment 12

10  at 15-16.)  The Court cannot find the "state court's determination was . . . unreasonable."

11  *Hibbler*, 693 F.3d at 1146.

12       The Court also finds the claim has no merit.  Although this claim was not raised on

13  direct appeal, Petitioner's appointed counsel for purposes of his motion for a new trial did

14  question Petitioner's trial counsel concerning third-party culpability as to Thomas during

15  the hearing on Petitioner's motion for a new trial.  Petitioner's counsel testified that he

16  considered and chose not to introduce evidence of third-party culpability as to Leroy

17  Thomas for numerous reasons.  (Lodgment 1, Part 11 at 2560-61.)  As explained in more

18  detail below, trial counsel knew that Thomas could connect Petitioner to Terry and he

19  was trying to distance Petitioner from Terry.  (*Id.* at 2561-62.)  Additionally, trial counsel

20  found Petitioner's own account of events, different a week before trial than it had been

21  prior, further supported trial counsel's decision not to raise third-party culpability as to

22  Thomas at trial.  (*Id.* at 2569.)

23       Trial counsel explained that he knew that Thomas had made statements to the

24  police.  (*Id.* at 2561.)  Thomas had indicated that Petitioner and his co-defendant Terry

25  were together on the day of the murder. (*Id.*)  Additionally, Thomas had claimed to police

26  that Terry told him that Terry and Petitioner had been at Pleasant's to rob him and that

27  Petitioner came out of the bathroom with a shotgun and shot Pleasant.  (*Id.* at 2561, 2610-

28  11.)  Trial counsel was concerned that if he raised third-party culpability as to Thomas,

Thomas might testify and the connection between Petitioner and Terry might have been presented to the jury.  (*Id.* at 2574.)

Thomas' potential to create a connection between Petitioner and Terry was very problematic for trial counsel.  Counsel wanted to distance Petitioner from Terry for numerous reasons.  The scientific evidence against Terry was stronger.  (*Id.* at 2562.)  Trial counsel needed to avoid any connection between the two to persuade the prosecutor to sever Petitioner and Terry for trial, which he did.  (*Id.* at 2573.)

Trial counsel was also aware there might be additional charges against Terry based on allegations Terry had sent messages out of the jail asking that Thomas be dissuaded from testifying, including, that he be hurt, and that Thomas was in fact hurt.  (*Id.* at 2573.)  Although not entirely clear, it appears this is the letter Petitioner describes Gonzaba helping Terry get out of the prison.  Trial counsel explained that a letter he was aware of before trial indicated Terry thought Thomas had inculpated he and Petitioner.  (*Id.* at 2614.)  He explains that the letter from Terry complained about "motor mouth," that he interpreted to be Thomas, "blound me and, even worse, the other boy," and later says he "let it all out on me and the other boy too."  (*Id.* at 2613-14.)  It also references Terry being charged as a gang member.  (*Id.* at 2613.)  Trial counsel was concerned that if he raised third-party culpability as to Thomas, there might be evidence introduced connecting Petitioner with Terry's attempts to intimidate Thomas. (*Id.* at 2574.)

Counsel also explained that third-party culpability as to Thomas was itself weak.  The only evidence connecting Thomas to the murder was what counsel considered weak DNA evidence linking Thomas to a piece of physical evidence in the apartment.  (*Id.* at 2562.)

Counsel also indicated in his testimony that his decision not to raise third-party culpability as to Thomas was bolstered when Petitioner told him, one week before trial, that he had arranged for Thomas to buy marijuana from Pleasant the day before the murder.  (*Id.* at 2569.)  Petitioner had previously claimed that he did not know Thomas.  (*Id.* at 2535.)  A week before trial, Petitioner told trial counsel he did know Thomas —

met Thomas outside a barber shop and they had become acquaintances — and that
Thomas had asked Petitioner to arrange for him to purchase marijuana from Pleasant.
(*Id.* at 2538-39.)  Petitioner additionally explained to his counsel that he made
arrangements with Pleasant the night before Pleasant was murdered for Thomas to make
a purchase from Pleasant.  (*Id.* at 2539.)  Petitioner also told his trial counsel that when he
tried to call Thomas the morning of the murder he got someone else — he thought it
might have been Terry, but did not know — and that person gave Petitioner a different
number for Thomas.  (*Id.* at 2546.)  Counsel was concerned this new version of events
involving Thomas might open Petitioner up to being an aider and abettor of the shooting
if Petitioner had made the arrangements for a drug buy that resulted in someone being
shot and killed.  (*Id.* at 2569.)

Trial counsel made a strategic decision to, at a minimum, avoid connecting
Petitioner to his co-defendant against which the evidence was stronger.  As with
Petitioner's other claims, there might have been some benefit in attempting to introduce
evidence suggesting someone else was responsible, but counsel would have been calling
a witness that put Petitioner with the individual against whom the evidence was stronger
and who had stated Terry and Petitioner had robbed and shot Pleasant.  Additionally, as
discussed more fully below, trial counsel unsuccessfully tried to admit third-party
culpability evidence as to Pleasant's brother, David Foster.  Attempting to raise third-
party culpability as to numerous individuals might have presented additional risks.  Trial
counsel reasonably elected not to take these significant risks with little likely benefit.

As to appellate counsel, the claim fails for the same reasons noted above.  Because
trial counsel was not ineffective in failing to raise the issue, appellate counsel reasonably
elected not to argue he was.  Additionally, appellate counsel "need not (and should not)
raise every nonfrivolous claim, but rather may select from among them in order to
maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288
(2000).  "Generally, only when ignored issues are clearly stronger than those presented,
will the presumption of effective assistance of counsel be overcome." *Id.* at 288.  Given

16CV188 LAB (BGS)

the many significant reasons trial counsel provided for not asserting third-party culpability as to Leroy Thomas, particularly the possibility that he might inculpate Petitioner, appellate counsel's election to pursue stronger claims was not unreasonable. The Court recommends Petitioner's claim that trial and appellate counsel were ineffective for failing to raise third-party culpability as to Leroy Thomas be **DENIED**.

### 4. Failing to Raise Insufficiency of the Evidence to Support First Degree Murder

Petitioner argues his trial and appellate counsel were ineffective because each failed to challenge the sufficiency of the evidence that he was in the apartment at the time of the shooting. (Lodgment 13 at 17.) Petitioner concedes the prosecution presented evidence of Petitioner's cell phone activity around the time of murder, evidence Petitioner was at Pleasant's apartment the night before the murder, evidence Pleasant was expecting him to return the next morning, evidence Petitioner's DNA was on a roll of duct tape in the bathroom of the apartment that Pleasant's girlfriend did not recall seeing before the murder, and Petitioner escaped from custody in Louisiana. (*Id.*)

Petitioner's argument relies largely on listing the items in the apartment that were tested for DNA and he was excluded as a source of the DNA. (*Id.* at 18-20.) He also dismisses the significance of his DNA being on the duct tape because duct tape is used to package marijuana and he had previously been in the apartment. (*Id.* at 17) He disputes the significance of the evidence that his cell phone was "pinging" off a cell tower near the apartment as not being specific enough given the evidence that a phone could ping off a tower from as far away as two miles. (*Id.* at 21-23.) Petitioner additionally notes the prosecutor's argument concerning Petitioner's phone activity ceasing for approximately eleven minutes that coincide with when the robbery and murder were taking place, but seems to only challenge that evidence as it relates to his being in the location. (*Id.* at 22-23.) He also argues there was no evidence of blood on his clothes at the time of his arrest or in his car. (*Id.* at 20.) Petitioner also argues Pleasant's statement, "they got me, oh God they shot me" immediately after the shooting, before he died, establishes Petitioner

did not shoot him because Pleasant, having seen Petitioner the night before, would have identified him by name.  (*Id.* at 24.)

As recited above in the Court of Appeal's summary of the evidence presented at trial, there was evidence from which a jury could find Petitioner was at the apartment at the time of the murder.  Petitioner was at the apartment the night before and Pleasant was expecting him to return the next morning.  Pleasant's girlfriend indicated that when she left the apartment at approximately 11:15 a.m. she and Pleasant planned to meet at noon, but Pleasant had indicated he was waiting for Petitioner to come to the apartment.  A visiting neighbor heard Pleasant tell a caller to hurry up and come because he was leaving soon.  When another visitor, Wishom, was leaving, two other men arrived, to which Pleasant responded "Oh, I've been waiting for you."  Wishom left as the men entered the apartment and at approximately the same time, a neighbor heard a melee and a loud boom from Pleasant's apartment, heard Pleasant crying for help, and looked outside to see two African American males running from the apartment with a backpack.  Pleasant sustained a large gunshot wound to the buttocks and blunt force trauma to the head consistent with being struck with a gun.  He died at the scene.  A jury could infer from this evidence that Petitioner was one of the individuals that arrived at the apartment right before the murder and was seen fleeing immediately after.  Petitioner is dismissive of the cell phone records presented, but as the Court of Appeal explained, they showed several short calls between Petitioner and Pleasant that morning between 10:37 and 10:39 a.m.  This further supports the expectation that Petitioner was expected at Pleasant's apartment that morning and was the person Pleasant stated "Oh, I've been waiting for you" to.

The apartment was in disarray, including an open empty safe in the bedroom and a bag of marijuana on the living room floor.  Police also found a slide from a firearm, handcuffs, and a handcuff key in the hallway.  As Petitioner acknowledges above, Petitioner's DNA was found on duct tape in the bathroom that Pleasant's girlfriend did not recall seeing in the apartment before.  This is further evidence from which the jury could infer Petitioner was in the apartment.  Although a jury might conclude his DNA

was on duct tape in the apartment from a prior visit as Petitioner now argues, that does not mean a jury could not reach a different conclusion about the duct tape and the reason it might have been in the apartment, particularly given the presence of handcuffs and a robbery.

As previously noted, there was stronger DNA evidence as to Terry — his DNA was found on a baseball cap, gun slide, blood samples from the apartment, and fingernail scraping taken from Pleasant, in addition to his fingerprints being on artwork in the living room. This is of consequence as to Petitioner because cell phone records show an 11:30 a.m. call placed from Petitioner's phone that lasted 59 seconds and terminated at the cell tower at Pleasant's apartment. Terry's phone also sent a text to Petitioner's phone at 11:33 a.m. There was no activity on Petitioner's phone from 11:31 to 11:48 a.m. followed by Petitioner and Terry's phones exchanging numerous text messages. Two hours later Petitioner's phone number is changed. The next morning, cell records on the new phone show Petitioner leaving California and traveling to Louisiana.

Petitioner was arrested a month and a half later in Louisiana. This lengthy gap makes Petitioner's emphasis on the absence of blood on his clothes and in his car less compelling. Additionally, as discussed above, there was evidence Petitioner asked an officer about whether he could be charged with a gang crime if the other person involved was in a gang and internet search history reflects Petitioner was searching for information about the murder and investigation.

Petitioner identifies ways in which the evidence presented could be interpreted in his favor, but that does not make an interpretation unfavorable to him wrong. For example, he argues that because the maximum distance his cell phone could have been from the tower was two miles this evidence was insufficient to show that he was in the apartment. In isolation, he might be right, but in the context of all the other evidence, a jury could interpret his phone pinging off a tower at the apartment as supporting or confirming he was in that location that morning.

16CV188 LAB (BGS)

1    As with the prior claim, the Court of Appeal's October 14, 2015 decision rejected

2  Petitioner's claim of ineffective assistance of trial and appellate counsel for failing to

3  raise insufficiency of the evidence for First Degree Murder because Petitioner failed to

4  submit any records or documents to support the claim.  (Lodgment 12 at 1-2.)  And, as

5  with his prior claim, the Court cannot find this was unreasonable.

6    The Court also cannot find trial or appellate counsel were ineffective for failing to

7  raise insufficiency of the evidence.  Although the evidence against him was

8  circumstantial, there was certainly sufficient evidence from which a jury could find

9  Petitioner was in the apartment and to support his murder conviction.  "[E]vidence is

10  sufficient to support a conviction so long as "after viewing the evidence in the light most

11  favorable to the prosecution, any rational trier of fact could have found the essential

12  elements of the crime beyond a reasonable doubt."  *Cavazos v. Smith*, 565 U.S. 1, 7

13  (2011). (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Not raising sufficiency of

14  the evidence, given the evidence against Petitioner, "falls within the 'wide range' of

15  professionally competent assistance."  *Buck*, 2017 WL 685534, at *13.

16    Similarly, because the evidence was sufficient, insufficiency of the evidence would

17  not have been stronger than the claims appellate counsel raised on direct appeal.

18  *Robbins*, 528 U.S. at 288 ("Generally, only when ignored issues are clearly stronger than

19  those presented, will the presumption of effective assistance of counsel be overcome.")

20  The Court recommends Petitioner's claim of ineffective assistance of trial and appellate

21  counsel for failing to raise insufficiency of the evidence be **DENIED**.

22          **5.    Failing to Raise *Batson/Wheeler* Challenge**

23    Petitioner argues his trial and appellate counsel were ineffective for failing to raise

24  a *Batson/Wheeler* challenge.[15]  (Lodgment 13 at 25.)  More specifically, Petitioner argues

25

26

27  ———————————

28  [15] *Batson v. Kentucky*, 476 U.S. 79 (1986); *People v. Wheeler*, 22 Cal. 3d 258 (1978).

his counsel was ineffective for failing to challenge the absence of African Americans on the jury.[16]  (*Id.*)

The issue here is not whether there was a *Batson* violation, but whether trial and appellate counsel were ineffective in failing to raise a challenge on this basis.  The standards articulated above, particularly the "'strong presumption' that counsel's representation was within the 'wide range' range of reasonable professional assistance" apply.  *Harrington*, 562 U.S. at 104.  However, the Court concludes that trial and appellate counsel were not ineffective for failing to raise a *Batson* challenge because what Petitioner alleges does not constitute the kind of purposeful discrimination in the selection of a jury that warrants relief under *Batson*.

A *Batson* violation occurs when there is purposeful discrimination in the selection of the jury.  *Batson*, 476 U.S. at 86.  "[A] defendant has no right to a 'petit jury composed in whole or in part of persons of his own race," but rather the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria."  *Id.* at 85-86.  It is a challenge to the use of preemptory strikes to exclude jurors based on their race.  *Id.* at 89. There are three steps that guide the review of the preemptory strikes: (1) a prima facie "showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose;" (2) if defendant makes that showing, the state must offer "permissible race-neutral justifications for the strikes;" and then (3) the court must decide whether defendant "has proved purposeful racial discrimination."  *Johnson v. California*, 545 U.S. 162, 168 (2005).

To establish a prima facie case of purposeful discrimination, the accusing party must show: (1) the prospective juror is a member of a cognizable group, (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motivated by race. *Boyd v. Newland*,

---

[16] For purposes of this analysis, the Court assumes that there were no African Americans on the jury.  As noted above, Respondent did not address this issue.

476 F.3d 1139, 1143 (9th Cir. 2006).  Here, Petitioner has made no showing that would give rise to a discriminatory purpose in the use of preemptory strikes.  There are no facts or allegations that a prospective juror that was a member of a cognizable group was struck by the prosecutor.  And certainly no circumstances raising an inference a strike was motivated by race.  The first step, the prima facie showing has not been made.

Given the absence of any basis for a claim, trial and appellate counsel's failure to raise it cannot constitute ineffective assistance of counsel.  The Court recommends Petitioner's claim of ineffective assistance of trial and appellate counsel for failing to raise a *Batson/Wheeler* challenge be **DENIED**.

### B.   Admission of Gang Expert Testimony[17]

Petitioner argues the trial court erred in admitting gang expert testimony addressing whether the charged offenses were committed for the benefit of a gang. (Pet. at 6.)  Petitioner argues the witness essentially testified, based on his review of all the reports and evidence in the case, that Petitioner and Terry committed the robbery for the benefit of a gang because the individual referenced in the hypothetical scenario presented to the witness was obviously Petitioner. (Lodgment 7 at 19.)  Petitioner argues this could give the jury the impression the charges were supported by evidence known to the witness, but not before the jury.  (*Id.* at 21.)

Respondent argues that this is a state evidentiary rule that does not present a federal question and there was no violation of Petitioner's due process rights recognized by the Supreme Court in the admission of the evidence.  Additionally, Respondent argues the evidence was properly allowed under California law.

In evaluating this claim, the Court of Appeal included a portion of the testimony Petitioner relied on in arguing the trial court erred in allowing the testimony.  The prosecutor asks a series of questions that involve a hypothetical in which two individuals,

---

[17] Petitioner raised this claim under Ground Two in his Petition.

1    one a documented gang member, and the other not documented as a gang member,

2    commit armed robbery of a drug dealer.  Applying California law, *People v. Vang*, 52

3    Cal. 4th 1038 (2011), the Court of Appeal found no error in the testimony because the

4    expert was allowed to testify that the conduct described was committed for the benefit of

5    a gang "based on assumed hypothetical facts rooted in the evidence." (Lodgment 6 at

6    24.)  The court also rejected Petitioner's claim that the testimony was improperly based

7    on evidence in the case, rather than being limited to hypothetical questions based on

8    evidence as required under *Vang*.  (*Id.*)  The court found the testimony "was offered in

9    response to 'the prosecutor's hypothetical questions . . . based on what the evidence

10   showed these defendants did, not what someone else might have done.'" (*Id.* (quoting

11   *Vang*, 52 Cal. 4th at 1046.).)

12       The admission of evidence is an issue of state law.  *Holley v. Yarborough*, 568

13   F.3d 1091, 1101 (9th Cir. 2009).  Even if the Court assumes there was any error in the

14   admission of this evidence, "[s]imple errors of state law do not warrant federal habeas

15   relief." *Id.* (citing *Estelle v. McGuire*, 502 US. 62, 67 (1991)).  "The admission of

16   evidence does not provide a basis for habeas relief unless it rendered the trial

17   fundamentally unfair in violation of due process." *Id.* (quoting *Johnson v. Sublett*, 63

18   F.3d 926, 930 (9th Cir. 1995)).  And, "[u]nder AEDPA, even clearly erroneous

19   admissions of evidence that render a trial fundamentally unfair may not permit the grant

20   of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as

21   laid out by the Supreme Court.  *Id.* (quoting § 2254(d)).

22       The gang expert's testimony did not render Petitioner's trial fundamentally unfair.

23   The testimony was phrased in terms of a hypothetical throughout.[18]  The opinion that an

24   armed robbery of a drug dealer committed by one documented and one undocumented

25   gang member was committed for the benefit of a gang only mattered if the jury found

26   _____

27

28   [18] In the one instance when the witness identified Petitioner by name, Petitioner's counsel
     objected and the objection was sustained.  (Lodgment 1, Part 8 at 1981.)

Petitioner committed the armed robbery of the drug dealer with a documented gang member.  This was not fundamentally unfair because the prosecutor still had to prove Petitioner's conduct matched the hypothetical.  Additionally, no Supreme Court authority forbids the admission of testimony from a gang expert to assist a jury in determining whether a crime was committed for the benefit of a gang.

The Court recommends Petitioner's claim that the admission of the gang expert's testimony violated Due Process be **DENIED**.

### C.  Juror Misconduct[19]

Petitioner argues the trial court erred in failing to question a juror regarding potential bias or misconduct.[20] (Pet. at 4; Lodgment 7 at 21-22.)  He argues an exchange between the prosecutor and a juror showed that a juror was biased in favor of the prosecution.  (Lodgment 7 at 21-22.) During the prosecutor's closing he is recounting the evidence that Petitioner was conducting internet searches for warrants and on the Who's in Jail website.  The following exchange occurred:

> Prosecutor:  But the important question you can't get around, and there's no reasonable alternate explanation for it, it why, why is he going to these databases?  Because at the end of the day he's not just putting in Pierre Terry's name, is he?  What other name did he put in when it came time to look for warrants?  Who was he worried about for getting warrants.
>
> Unidentified juror: Himself.

---

[19] Petitioner raised this claim under Ground Three in his Petition.

[20] To the extent Petitioner argues his trial counsel was ineffective for failing to object to the alleged juror misconduct, the record reflects that his trial counsel did not hear the juror respond to the rhetorical question.  Additionally, as the trial court noted, he might have elected not to object to avoid drawing more attention to it even if he had heard it.  As the Court of Appeal and the trial court explained, it was not a disputed issue and objecting might have just led the entire jury to believe it was more significant.  To the extent there was any error in missing it or not objecting, it was not the kind of error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Buck*, 2017 WL 685534, at *13.

16CV188 LAB (BGS)

Prosecutor: That's right, himself.  Why am I looking up warrants for myself when I didn't do anything?

(Lodgment 1, Part 9 at 2223-24.)[21]

The Court of Appeal found the remark did not suggest that the juror had formed an opinion on the case or that good cause existed to remove the juror.  The court explained that the remark was brief and just provided an answer to a rhetorical question.  The court also agreed with the trial court that the answer to the question was not in dispute.

Clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias is raised by the parties.  *Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th Cir. 2003) (citing *Remmer v. United States*, 347 U.S. 227 (1954) and *Smith v. Phillips*, 455 U.S. 209, 217–18  and finding no error where trial court, during questioning of one juror about potential misconduct, declined to inquire about other jurors who were potentially subject to misconduct); *Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005) (trial court need not order a hearing *sua sponte* whenever presented with evidence of juror bias).  When considering a claim of juror bias, federal district courts "should 'consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source' when determining whether a hearing is required."  *Sims,* 414 F.3d at 1148 (quoting *Tracey*, 341 F.3d at 1044).  Certainly no more is required of a state court to comply with Due Process.  *Id.* ("It would be anomalous to require more of a state trial judge in order to comply with the Fourteenth Amendment's Due Process Clause.")

Here, the juror misconduct issue was raised as part of Petitioner's motion for a new trial.  The trial court considered it.  (Lodgment 1, Part 11 at 2389-2395.)  Because the

---

[21] Petitioner's counsel did not hear the response from the juror and although the trial judge did, he elected not to raise it out of concern that he would draw more attention to the issue.  (Lodgment 1, Part 11 at 2393.)  The issue was not raised until Petitioner's motion for a new trial approximately a year later.

exchange was undisputed and in the transcript, the content of the allegation and the credibility of the source of the alleged misconduct were not at issue.  The only real issue was how serious the alleged misconduct or bias was.  In short, the juror answered a rhetorical question that substantively concerned whether Petitioner was searching online to find out if there was a warrant out for his arrest.  Petitioner's counsel for the motion for a new trial argued it showed the juror had already made up his or her mind about Petitioner's guilt.  (*Id.* at 2392.)  The trial court was not even convinced it was misconduct.  (*Id.* at 2395.)  The trial court considered whether the juror speaking up indicated the juror had drawn a conclusion about Petitioner's guilt and explained that at most, it showed that this juror may have made up their mind that Petitioner was searching online to see if there were warrants out for his arrest.  (*Id.*)  In the alternative he suggested the juror may have just been caught up in the closing argument.  (*Id.* at 2394.)  The trial court noted that this, Petitioner searching for warrants for himself online, was not in dispute.  (*Id.* at 2394.)  He contrasted the question here with something that was disputed, "who fired the gun," and suggested a response to a question like that would be significant.  (*Id.*)

The Court of Appeals reasonably concluded that the brief, spontaneous remark on an undisputed issue "did not suggest that the juror had formed an opinion on the case." (Lodgment 6 at 27.)  The Court recommends Petitioner's claim of juror misconduct or bias be **DENIED**.

### D.    Admission of Evidence of Petitioner's Tattoos[22]

Petitioner argues the trial court violated his Fifth and Fourteenth Amendment rights in admitting evidence of Petitioner's tattoos.  (Pet. at 8; Lodgment 7 at 22-24.) Petitioner argues the admission of the tattoos portrayed Petitioner as greedy and disrespectful of women.  (Lodgment 7 at 24.)

---

[22] Petitioner raised this claim under Ground Four in his Petition.

36

1    Respondent argues the tattoos were probative of Petitioner's membership in a gang

2    for purposes of proving the gang enhancement under California Penal Code § 186.22(b)

3    because evidence of gang-related tattoos tends to prove gang membership.  Respondent

4    emphasizes the prosecution had to prove Petitioner committed his crimes for the benefit

5    of the Skyline Piru gang and Petitioner disputed he was a gang member or had done

6    anything to benefit a gang.  The gang expert testified that Petitioner's tattoos — MOB for

7    "money over bitches" and a gun with the words "dead presidents"— were common

8    among gang members, but not a specific gang.

9        The California Court of Appeal found the tattoo evidence was highly probative to

10   prove the gang enhancement.  (Lodgment 6 at 32.)  The court noted the gang expert's

11   testimony that these and similar tattoos were common among gang members.  (*Id.*)  The

12   court also explained that having gang-related tattoos was highly relevant to demonstrate

13   membership in a gang for purposes of proving the gang enhancement.  (*Id.*)  The court

14   rejected Petitioner's argument that the tattoos should have been excluded because the jury

15   might have thought he was greedy, violent, or valued money over women.  (*Id.*)  The

16   court concluded the trial court did not err in admitting the evidence.

17       As previously noted, the admission of evidence is an issue of state law.  *Holley*,

18   568 F.3d at 1101.  Even if the Court assumes there was any error in the admission of this

19   evidence, "[s]imple errors of state law do not warrant federal habeas relief."  *Id.* (citing

20   *Estelle*, 502 U.S. at 67).  "The admission of evidence does not provide a basis for habeas

21   relief unless it rendered the trial fundamentally unfair in violation of due process."  *Id.*

22   (quoting *Johnson*, 63 F.3d at 930).  The Court cannot find the admission of this evidence

23   rendered Petitioner's trial fundamentally unfair.  His gang membership was disputed.

24   The gang expert testified that Petitioner was not a documented gang member, the police

25   had no gang-related contacts on file for him, and the gang expert assigned to the gang

26   Petitioner was alleged to be associated with had no knowledge of Petitioner prior to this

27   case.  (Lodgment 1, Part 8 at 2005-07.)  It was not fundamentally unfair to admit

28   evidence that was probative of proving the gang enhancement.

Additionally, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court. *Holley*, 568 F.3d at 1101 (quoting § 2254(d)). Absent clearly established Federal law forbidding the admission of evidence under these circumstances, Petitioner is not entitled to habeas relief. The Court recommends Petitioner's claim that the admission of his tattoos violated Due Process be **DENIED**.

### E.    Exclusion of Evidence of Third Party Culpability[23]

Petitioner argues the trial court violated his Fifth and Fourteenth Amendment rights by excluding evidence of third party culpability as to David Foster. (Pet. at 9; Lodgment 7 at 24-27.) Petitioner's trial counsel sought to admit evidence that Pleasant got into a physical altercation with his half-brother, Foster, who at the time was living in the apartment. (Pet. at 9; Lodgment 7.) The altercation was apparently about Foster not having a job. (Pet. at 9.) At Pleasant's demand, Foster moved out following the altercation and Pleasant's girlfriend believed they never reconciled. (*Id.*) Additionally, DNA from blood stains in the apartment matched DNA from Foster. (*Id.*)

The California Court of Appeal noted the above background proffered by Petitioner's counsel. (Lodgment 6 at 36.) The court also noted that the blood recovered was no more than a speck, Foster often visited the apartment to clean up after skateboarding accidents, that Foster had indicated to police that he and Pleasant had reconciled after the altercation and spent Earth Day together. (Id. at 36-37.) The prosecutor produced a date-stamped picture corroborating they spent Earth Day together. (*Id.* at 37.)

The Court of Appeal found the trial court could reasonably find the speck of blood from Foster in the apartment doorway was no more than a remote connection to the crime

---

[23] Petitioner raised this claim under Ground Five in his Petition.

scene, particularly given he lived in and visited the apartment and in the absence of any evidence connecting him to the scene near the time of the murder.  (Lodgment 6 at 37.)  The court also found the trial court could reasonably conclude that the single altercation months prior was nothing more than mere motive and insufficient to raise reasonable doubt as to Petitioner.  *(Id.* at 38.)

As previously noted, "a federal habeas court cannot review questions of state evidence law and it is well settled that a state court's evidentiary rule, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process."  *Spivey v. Rocha*, 194 F.3d 371, 977-78 (9th Cir. 1999).  "[T]he Constitution permits judges 'to exclude evidence that is repetitive . . . only marginally relevant, or poses an undue risk of harassment, prejudice, or confusion of the issues.'"  *Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006).  Third party culpability evidence "may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact at issue at the defendant's trial."  *Id.* at 327 (quoting 40A Am. Jur. 2d, Homicide § 286, pp 136-38 (1999) as "widely accepted" rules).

The Court of Appeal reasonably concluded that the evidence as to Foster was too remote and speculative.  Foster's only recent connection to the crime scene was a speck of blood in an apartment he had previously lived in and his previous adversarial connection to Pleasant was apparently resolved.  The Court cannot find the exclusion of this evidence rendered the state proceedings so fundamentally unfair as to violate due process.  Nor can the Court find the Court of Appeal's decision was unreasonable.

Additionally, it is not clear Petitioner still intends to pursue this claim.  As noted above, in listing the claims he raised on collateral review, Petitioner references Exhibit B, attached to his Petition.  Exhibit B is his Petition for Review to the California Supreme Court raising the claims discussed above on collateral review, also Lodgment 13.  In that filing Petitioner indicates "trial counsel should have moved to present evidence of third-

party culpability, *the third party being not David Foster*, but Leroy Thomas." (Lodgment 13 at 11.)

The Court recommends Petitioner's claim that the exclusion of third-party culpability evidence violated Due Process be **DENIED**.

### F.    Stay and Abeyance

In addition to numerous other documents attached to the Petition, Petitioner included a document requesting stay and abeyance to exhaust the three new claims he raised on collateral review in state court. (Pet. at 15-19.) Respondent filed an Opposition to the request. (ECF 14.) Respondent cited the Lodgments filed in support of Respondent's Answer to the Petition that showed the Superior Court, Court of Appeal, and California Supreme Court had all denied the claims for failing to provide any evidentiary support for the claims. (*Id.*). Petitioner then filed an Opposition for Stay in which indicates he has exhausted the three claims raised on collateral review and notes that Respondent failed to address those claims. (ECF 28.)

To the extent there is a stay and abeyance motion properly before the Court, it is moot. Petitioner and Respondent agree there is no need for a stay because the claims were exhausted. To the extent they do not, the Court has considered the merits of these claims and recommends they be denied. The Court recommends that any request before the Court for stay and abeyance be **DENIED**.

## IV.    Evidentiary Hearing

Petitioner does not request an evidentiary hearing in his Petition. In his Traverse under the section addressing third party culpability as to Foster, Petitioner notes the need for an evidentiary hearing to address whether Foster and Pleasant had reconciled.

AEDPA prescribes the manner in which federal habeas courts must approach the factual record and "substantially restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir.1999). "[A] determination of a factual issue made by a State court shall be presumed to be correct," with the petitioner having "the burden of rebutting the presumption of correctness by

clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  Section 2254(e)(2) limits "the discretion of federal habeas courts to take new evidence in an evidentiary hearing." *Cullen*, 563 U.S. at 185.

"If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Cullen*, 563 U.S. at 185("[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review").  If a claim subject to 28 U.S.C. § 2254(d)(1) does not satisfy that statutory requirement, it is "unnecessary to reach the question whether § 2254(e)(2) would permit a [federal] hearing on th[at] claim." *Id.* at 184 (citation omitted).  "In practical effect, . . . this means that when the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'" *Cullen*, 563 U.S. at 183. (citation omitted).  Since *Cullen*, the Ninth Circuit has held that a federal habeas court may consider new evidence only on de novo review, subject to the limitations of § 2254(e)(2).  *See Stokley v. Ryan*, 659 F.3d 802, 808 (9th Cir.2011).

As explained above, Petitioner is not entitled to relief under § 2254(d) and has not met any of the exacting requirements for an evidentiary hearing on federal habeas review. Accordingly, the Court recommends Petitioner's request for an evidentiary hearing be **DENIED**.

## V.   CONCLUSION & RECOMMENDATION

For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) denying the Petition.

**IT IS ORDERED** that no later than **March 24, 2017,** any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **April 7, 2017.**

1    The parties are advised that failure to file objections within the specified time may

2  waive the right to raise those objections on appeal of the Court's order.  *Turner v.*

3  *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th

4  Cir. 1991).

5  Dated:  March 3, 2017

6                                                  _____

7                                                  Hon. Bernard G. Skomal
                                                   United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16CV188 LAB (BGS)